Good morning, Your Honors, and may it please the Court. It is the defendant's position in this case that difficult, often unpleasant, and at times pleasant living conditions between a nanny and an abandoned mother, a single mother of three children, do not rise to the level of forced labor. And I want to begin with the forced labor argument because in this particular case, because of the sentence imposed, it drove all the guidelines, including the guidelines for the uncontested visa fraud convictions. We believe that this case stretches Section 1589, the relevant statute in this case, past the breaking point. And as this Court has noted in its prior decisions in Neville's and in Goyal's, that there are instances in which the Court needs to closely examine, in fact scrutinize, the trial record to determine whether or not the evidence submitted to the jury in fact supports the statutes of conviction. Because this is right at the margins of Section 1589, we suggest that Goyal's and Neville's should be very, very stringently applied. The statute itself describes the four ways in which forced labor can be committed. Some involve the use of force and threats. The fourth, which is the theory under which the government directed its case, is the schema pattern. And if the Court will remember, the district court actually expressed some skepticism at the conclusion of the government's case during our first Rule 29 hearing over precisely what theory it is that the government wanted to submit this case to the jury on. And the government conceded at that point that it was narrowing its theories down to two. One was financial harm. One was reputational harm. And the Court will note that at page 60 of the excerpts of records that the denial by the district court of our Rule 29 motion addressed both of those two issues. One of the things that I want to stress, Your Honors, is that to the extent that the government rested its case on financial harm is that the payment terms between Ms. Pena-Canal, the plaintiff witness, and my client, Ms. Dunn, were never really clear. They first met in Peru. There was some official discussion about how payment was going to be obtained or whether it was going to be obtained, but no agreement was reached prior to Ms. Pena-Canal actually coming to the United States. In fact, she understood that Ms. Dunn was still trying to sell houses to earn money to pay her. We believe that the clearest evidence that financial harm could not be a predicate for the jury's verdict in this case came from the complaining witness's testimony herself. After this case was underway and being investigated, she was examined and interrogated – well, not interrogated, but during the course of the investigation by the investigating agents, she was asked numerous times, why is it that you continue to stay there? And as far as financial harm is concerned, she answered, look, this was not about the money. I just wanted to stop fighting with her. If we could stop fighting, then everything would have been all right. Testimony is important. And that's one of the reasons that I cited Bivella's case of this Court in our 28-J letter. That is the case out of the Eastern District in New York where a judge, senior Judge Block, looked at a very, very similar case, a defendant who had been brought in from Ecuador and was promised payment and was promised that she would have the opportunity to go to school and back to go to school at the defendant's expense. And she, similarly, when those results did not obtain, sued civilly under the civil statute, which relies on Section 1589 for its component parts. And Judge Block went through each element of the complaining witness's deposition testimony and said, this doesn't cut. Your claim of financial harm is insufficient. Your claim of conduct which occurred after the time that you left is insufficient. And for these reasons, your motion for summary judgment is denied. Bivella's is not only important for that reason, but I think it's important because there's so much similarity between that case and this case. And Bivella's involving a civil matter which involved a lower burden of proof. The judge found that she didn't even have enough to get to a jury. And if it was not enough in the Bivella case, I submit that it was not enough here. Now, there's no question that Ms. Pena-Canel's testimony undermined the financial harm theory. The government does not, as far as I can recall, even respond to her testimony about staying in Ms. Don's employ if only they would stop fighting, and it's brief. What they do do is spend a substantial amount of time talking about the length of the relationship and the various things that happened at discrete points in time, but it's not tethered to any testimony by Ms. Don as to why she stayed. And I believe by the victim, the testimony by the victim. The complaining witness, yes. But certainly there's no question that there's an evolution here. Yes. And the question then is whether or not things changed sufficiently dramatically by 2007, I think it was early 2007, to begin to meet the standards of the statute. Well, Your Honor, I believe there was testimony that things changed somewhat in 2007. 2008 seemed to be kind of the defining point, because that's the point at which the complaining witness says things were so bad that I thought that I had to leave. She certainly said that things had changed somewhat in 2007, but I believe not only was it the complaining witness's testimony, but even the government acknowledged that 2008, although it didn't say precisely what the lines of delimitation might be, that that was the period in which things were so bad that things started to deteriorate where the complaining witness started to leave. To answer more precisely your point, there is an evolution possibly of conduct which the Court might find a little bit troubling in sense of whether the defendant had anger management issues or had a difficult time just kind of dealing with life in general. But the question ultimately becomes, at that time, is there enough in the record to support us finding a forced labor? And it's the appellant's position that, no, it did not. By 2008, all we have is testimony by the complaining witness that her food, she wasn't eating as much as she had in the prior two years, that the appellant was acting irrationally, that she had made accusations of theft during the course of their time. She felt compelled to stay there. That wasn't the reason that she gave. The reason she said was, I just wanted to be here. I wanted to do some studying. If we had stopped fighting, that would have been enough. But what does the Court rely on the note that your client had her sign which said basically I've been paid minimum wage. I don't have any claims. How do you respond to the district court's analysis? Well, I think all that is evidence of is the defendant conceitedly was trying to establish some type of record. But, you know, with respect to whom? This could have been a record that you wanted to show the investigation under the Fair Labor Standards Act or some worker's plaintiff's advocate or possibly even for tax purposes. But that's not the issue with respect to whether or not this particular complaining witness stayed because she felt that if she didn't stay, she wouldn't get paid at some point in the future. It was just hard to do. Well, not only not get paid, but would be charged for room and board and other expenses, widow money. Well, Your Honor, if I can. Again, we're talking about drawing inferences in a different way post-verdict, so. Well, I'm not sure if it's just a question of drawing inferences. I think especially in a case like this, which we believe is kind of at the margins here, you need to really closely examine what it is that the complaining witness says about the reasons they felt compelled to stay. And unless there was a specific statement as to financial harm that she was going to suffer if she left or reputational harm, both of these being the theories that were advanced by the government as to why she stayed, I don't believe that there is sufficient evidence in the record. And I'd like to address the reputational harm issue briefly, if I may. This is a prior question. You're resting your entire analysis on what the victim said motivated her to stay. The statute puts the responsibility on Ms. Dan, on your client, and raises the question, whoever benefits, I'm sorry, whoever knowingly provides or obtains the services of another by means of a scheme intended to cause that person to believe that if she didn't perform such services, that person would suffer serious harm or physical restraint. And you're saying that your – that the victim's testimony doesn't meet the standard of serious harm or physical restraint? It does not. I do not believe that with respect to the theories that were narrowly sent to the jury in this case, again, they were financial harm and reputational harm. I don't think the Court should be going beyond the two theories that were acceded to by the government as the basis for its going forward with this 1589 charge. And to the extent that there is no evidence of reputational harm or financial harm sufficient and supported by the complaining witness's testimony, then no, it's not a question necessarily of the burden or some sort of burden being on my client to show why it was that she didn't intend to do this. It was the government's burden to show that this particular complaining witness stayed in my client's employ because she feared either reputational harm or financial harm. And we do not believe, and I'd like to just briefly address the reputational harm issue, that the testimony was sufficient. What Ms. Pena-Canal said was she, Ms. Dann, had been accusing me of theft during the course of our relationship. We can see that Ms. Dann, at some point during the course of the relationship, told Ms. Pena-Canal, I'm missing $13,000. And I think the Court needs to keep this in context as well, because if you look at the record, that first accusation had to do with some missing money that Ms. Dann thought that Ms. Pena-Canal had taken. At some point she found it, and what she threatened to do was, if, in fact, you had  She didn't say, if, in fact, you took this money, I'm going to, you know, spread it far and wide that you're an unreliable employee. I'm going to spread it far and wide that you're somebody who should not be trusted. And then, in fact, the government, in its efforts to sustain the conviction, was telling the Court during the Rule 29 hearing, here's another issue. At the time that Ms. Dann came to pick up her kids after the complaining witness had left the home, she then spread it far and wide to anybody with an earshot that the client had, excuse me, that the complaining witness had cleaned out her house and stolen her jewelry and things of that nature. That was one of the things that the district court seized on as being emblematic of the client's intent. But again, as the Velez case shows, this kind of post-criminal conduct conduct is not sufficient. I mean, the fact that the complaining witness had already left the house could no longer be influenced by anything my client did or did not do, and the fact that, at that point, Ms. Dann told people at the school that she had taken money, is not sufficient to sustain a conviction of forced labor based on a reputational harm theory. Counsel, I would like you to address the rather difficult issue of restitution. Let's assume that there has to be restitution. How should that be done? Well, Your Honor, I have no qualms if the court chooses to uphold the convictions that restitution be ordered. The question becomes That's not the issue. Let's just assume that just for the purpose of this argument as to what to whom should the restitution run and how should it be calculated? The restitution may run to Ms. Pena-Canal. My only point, Your Honor, is that it has to come from an asset which is properly within the court's jurisdiction. We do not believe, based on California law, that the arrearages owed to my client by her former husband are properly within the district court's authority to order. There is far too much of a primary interest articulated by the California courts, from the Courts of Appeal to the Supreme Court in the Cromer case, that the benefits of the children are something that are paramount. And especially if they're under the age of majority. Correct. And in this case, they are under the age of majority, Judge Gertner. So I don't think that there is any question that although restitution may be appropriate, it needs to happen in the correct form. I just want to briefly say that I'd like to argue for a couple of minutes in rebuttal. I'm getting down to about a minute and a half here. Why don't you complete your answer here, and you're going to have additional time. Thank you very much. This is my other point, Judge Fletcher. It shouldn't be incumbent upon the defendant, if the court makes an order in excess of its jurisdiction, to try and go out and remedy things and then come back and tell the district court that, well, I can't do this because California law says that I can't, or because a family court is going to order me to do this and such with these arrearages. I think that unless the court actually goes after an asset which is provided for under the Mandatory Victim Restitution Act, that a restitution order beyond the scope of that act, and it reaches an asset that we believe under California law is properly belonging to the minor children of the client, is something that the district court could not do. There were various other assets that were properly within the court's jurisdiction, and in fact, an order was entered to that effect. We just believe that child support arrearages are beyond the scope of this court's jurisdiction, that it's something that ought to take place in a California family court where my client's obligations can be fully taken into account, and so she is not placed in the untenable position of possibly violating some California family court order or California support order or something of that nature, and then have to come back to the district court to sort it out. I believe the appropriate venue would be the California family court. I hope I've responded to your question, Judge Fletcher. Roberts. Thank you, counsel. Thank you. Good morning. May it please the Court. My name is Mary Jean Chan, and I represent the United States in this appeal. The evidence in this case was sufficient to uphold the jury's verdict of conviction on the forced labor, document servitude, as well as harboring an alien for private financial gain counts. As well, the court did not err in calculating Dan's guideline range and ordered a perfectly legal restitution order. I will focus my argument on the forced labor conviction as well as the restitution since that was the primary focus on the opening argument. Congress specifically passed 1589 in the specific recognition that labor can be coerced by means other than literal whips and chains. It specifically enacted 1589 to encompass subtle forms of coercion, such as what we saw in this case. So I disagree with opposing counsel's characterization. If you're so subtle that the victim doesn't recognize them, does that support your – can that support the conviction under the statute? Well, Your Honor, I think what Judge Gertner said is – actually gets to the point, which is that the reasonable – the standard in this case goes to a reasonable person of the same background and characteristics as the victim in this case. So while the victim's testimony is very pertinent as to how she perceived certain harms, what's really salient isn't so much whether she specifically articulates that she felt coerced by a certain harm. What's most important is whether the jury could find that a person who came from the mountain regions of Cusco didn't speak English, didn't have a passport, didn't have any social connections in this country, didn't have any money, didn't have any passport or identification, would in that situation, deprived of the means of either earning a living in the United States once she left Dan's employee or returning to her home country of Peru, whether somebody with those circumstances could feel as though she were coerced into continuing to provide child care services for Dan. And in this case, the jury did find that, and the jury's verdict was based upon sufficient evidence provided in this case. I'd like to talk about sort of the Neville standard and what the opposing counsel has said sort of restricts the consideration of evidence by this court. And I absolutely disagree that because the government counsel might have distilled the arguments in a post-trial motion discussion about what supported the verdict in terms of distilling it down to the reputational harm and the financial harm, that that is all that this court is enabled to consider in looking at the sufficiency standard. What the issue is, is that the government argued, and the jury in this case, was instructed on one of four potential theories under 1589. As to do it by your argument, you don't think that the financial argument or the reputational damage argument is sufficient? No, we do. But we think that this court can also, if the court, for example, wants to look, it can look at more evidence. So, yes, those are sufficient. But there's more harms. For example, the child care harm. Let's take reputational harm, though. How do the post-departure reputational statements impact this? Well, the post-departure reputational statements corroborate and would allow the jury to infer that that was part of the scheme to cause Pena Canel, the victim in this case, not to leave. That when she said that there was a plan or a pattern, if the theory is that there was a plan or a pattern by which Dan convinced or caused Pena Canel to stay because she was concerned that if she left, she would be labeled a thief, then the jury could look at the fact that there were all these statements, specifically, while she was there, saying, you stole my money, you are a thief, I'm hiding the fruit because you're a thief in the closet so you can't eat it, and that's corroborated by what she actually does. She carries out the threat. If you leave, which she did, Pena Canel left, then I will call you a thief. Pena Canel left, and she indeed called her a thief. The first things out of her mouth when she went to the school was, she stole my money, she stole my keys, she stole my jewelry, and then several, you know, some time passed, she spoke to Amy Oz, another parent, and did the same thing again. So that is something that the jury could consider in understanding or interpreting those statements that were pre-departure. Okay. Now, what are the other you wanted to argue, something besides financial and reputational harm, what do you want to do? Yes. Well, actually, the financial and the reputational harms, I would also argue that while they're individually could be serious harms, they should be really looked at together and collectively. So the statute talks about serious harm, not a single serious harm. So what is really the essence of this is that the reputational harm and the financial harm, as well as the concern about authorities or deportation, that should all be looked at collectively as a constellation of harms that would lead Pena-Canel to believe that if she left, she would basically be without any means of surviving. The other harm that I would like to talk about is the harm to Pena-Canel's charges, Dan's children. And this is specifically contemplated in the charge, the conference report that Congress issued in discussing its enactment of Section 1589. It stated that it was intended that prosecutors will be able to bring more cases in which individuals have been trafficked into domestic service, where traffickers use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, quote, as when a nanny is led to believe that children in her care will be harmed if she leaves the home. That's something that was specifically contemplated at CICO Congress, and that is a circumstance that was specifically demonstrated in this case by the evidence. The government argued this case, this argument, actually. If you look at supplemental excerpts of record 160 to 61, you can see that the government counsel specifically made this argument to the jury. And in fact, it was responded to by defense counsel, and that's at excerpts of record – supplemental excerpts of record 179 to 80. So this was specifically argued by the government. It was contemplated by Congress. And the evidence showed that at the end of February 2007, Dan explicitly cried and told Pena Canal that you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know what would happen to my children. Where would I keep them? The government would take them from me. She later on in the summer of 2007 also told Pena Canal that one of the reasons she could not talk to anybody, she was not allowing her, that is, Pena Canal, to talk to anybody was because of my kids. I don't want for them to get hurt. I don't want people to, something could happen. And that's at excerpts of record 191. A reasonable person with Pena Canal's background, somebody who is a professional nanny who had been the exclusive caretaker of Dan's children from at least July 2006 when she entered the country and for a period of time in 2002, who testified that she was the person who was responsible for waking the children up, getting them dressed, feeding them, taking them to school, feeding them lunch, taking them back from school, helping them with their homework, helping them get dressed or bathed and washed at night, giving them dinner, somebody in that position would be reasonably concerned that something that happened to her charges would be a serious harm, that taking them away, and in fact, taking them away from their mother would be a serious harm. Wouldn't that adhere in almost any nanny relationship? In other words, we're tapped to tease out of this nanny-employee-employer relationships that fit within the statute as criminal coercion, as opposed to, gee, I'm really essential to this woman, I'm essential in so many ways, and if I stop doing these tasks, something will happen to her. That's why it seems to me the focus is on what Dan intended. That's absolutely correct, Your Honor. The focus is on what Dan intended. And given the fact that at the end of February 2007, she specifically linked Dan's departure to the harm to her children, that the jury had enough there to find the criminal intent. If the jury didn't find criminal intent on Dan's part, that's correct. The consequence wouldn't be enough. What's essential in 1589 – This is so important. Why didn't the government argue this before the district court? I can't speak for that. I wasn't the person there. I think perhaps I'm insufficient, but I think it's something that this Court certainly can consider. And the district court didn't rely on it. That's true, but this Court can rely on any grounds that are supported by the record. And so this is an additional ground. And, in fact, the testimony shows that Pena-Canel, in fact, in this case, did feel coerced. She specifically said that she was concerned about the children, and that was why she couldn't leave. And, frankly, it's, again, this is all the harms that we've kind of sort of distilled and labeled separately as harms to children, harms to the reputation. They really, again, need to be looked at collectively, because the harm to the children can also be linked to the reputational harm. And the fact that this is a person, Pena-Canel, is a nanny. She's high school educated, and she's never done anything other than be a nanny. So her job is taking care of kids. She has really no other skills that are marketable from her perspective, a reasonable person from her perspective. So if she were to leave the children in a lurch and to cause them to go into government custody, which she might very well believe would be the case, since Dan is never around to take care of them, and she has no familiarity with American laws, that that would cause her reputational harm as well, that she wouldn't be able to go out and get another job as a nanny. So those are reasonable inferences that a person that of Pena-Canel's position and background and circumstances would find from this situation. And the jury was presented with this, and it's something that could have supported their verdict. Roberts. Do you want to talk about the restitution issue? I would like to talk about the restitution issue, Your Honor. So I apologize for sending in a 28-J letter belatedly. I was working this weekend, and I found a case, which is this State of Spiritos. I've provided the Court with copies this morning of it. It's a Ninth Circuit case that specifically recognizes that under California law, child support arrearages are the property of the parent and not the child. To the extent that there is any concern about what the property itself is in terms of the beneficial interest to children, the child support is intended to pay for things that support the child. In this case, what we're talking about with restitution is Pena-Canel was hired to be the nanny. This is the wages that she is owed. She, for 2006 to 2008, provided child support services. And so it makes perfect sense that it was the beneficial interest of the children to have a nanny, in this case where their mother was working, and that the restitution, that would be even if it were beneficial to them, would be paid. Otherwise, there would be a windfall in this case. What would prevent the government from going into family court and making the same argument in California? I'm not sure that I'm not very familiar with family court in California, but I don't think – I'm not sure what the government's standing would be in that case.  I mean, the problem is, you've got – we have a – as you can imagine, we've got family court order. We have a district court order that essentially supersedes that, without all the parties to the family court present in the criminal proceedings. Well, the restitution order, Your Honor, I think the form of the – not the restitution order itself, but the portion of it that's directed to child support services. I'm sorry? I'm talking about the child support provision of the restitution order. That's correct. Not the fact of restitution. Right. No, I understand that, Your Honor. I think that the restitution order with respect to the child support arrearages is crafted in a way that only says that if Dan receives child support arrearages, the $30,000 that was owed during this period of time when Pena Canal was providing coerced labor, that then that should be signed over Pena Canal. It doesn't talk about child support in the future, and it doesn't talk about anything – I understand. It doesn't – But it's reversing the presumptions, the arguable presumptions under California law. In other words, the presumption is that the arrearages under the Comer decision go to children under the age of majority. And this is now saying that this is an asset of Mrs. – of Mrs. Dan's that can go to the victim in this case. It's – there's another – the order was done sort of in the alternative, that if some – if the children really needed it, a modification can be made. But that's really reversing the presumption in this case. The presumption is that the arrearages are for the children. Well, I disagree with the interpretation of Comer, Your Honor. I think that Comer is an equitable estoppel case. And the presumption that somebody could be equitably estopped from collecting property, the presumption or the assumption under there is that it's actually the parent's property to collect. It might be for the beneficiary interest of the children. But in this case, it is still – the fact is that it's still the parent's property to – to collect. And Comer specifically at 522 talks about this concept of equitable assignment and says, quote, It's a creature of equity and applies to all cases where one party involuntarily pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the father. So in that case, it was talking about, I believe, the AFDC and whether it had a right to then collect the money because it had been paying child support that the father should have done. And this is an analogous situation. Basically, the victim in this case, Pena Canel, was subsidizing these child care costs that should have been paid for by the father. And so in this situation, the government believes that the restitution order was proper and legal. It was legal both because as a matter of California law, it was the mother's property and it's also – You relied on Utigard, but Utigard has a provision saying – a statement, We don't reach the question under which conditions the children might be deemed beneficiary of arrearages and child support. So Utigard doesn't go as far as you'd like it to go. And I'm not sure any California law really, in the case I've seen, is precisely on point. So that does raise a question of whether we're interfering with the operation of California family law. Well, I think the other point that was kind of alluded to by the district court is that there – to the extent that there's any sort of concern about the children having an entitlement to this money which should have been paid, had it been paid in a timely fashion, should have been paid towards their child care costs, which was Pena Canal, their full-time nanny, that that's something that they can also do in state court. For example, Mr. Crabb, the father who – How can they do that if there's a federal court order that says it's – if it's paid on account of the arrearage as it goes to the victim? I mean, the children – this order was entered without the children's guardian ad litem or any representative of the children there. Well, for example, I see I've run out of my time, but in Boston v. Gardner, for example, the court talked about how in – under Oregon law that the parent is really just a trustee, so really that the funds go into a trust, essentially. So the California state courts could certainly say these funds really are not to be paid for anything other than the children they put in trust. Pardon? I didn't know that. I mean, you cited an Oregon case for California law. No, no, no. I'm not saying that it actually is. I'm saying that the court – So what's your best California case that says that now the state court could order that the payments be altered in a way that would avoid federal judgment? I don't think it would avoid federal judgment, Your Honor. I mean, because – well, it would avoid federal – If I were a state court judge and I were faced with this order, I'd have to look twice on it and – to the extent of having it. And then the government might welcome it and say, no, this money is – it goes to the victim and not the kids. My point being, we are interfering with the state proceeding in a fairly profound way with none of the parties to the state proceeding there except for the wife. But the – I think that the restitution order as – with respect to the child support order is very limited. It simply talks about those order – the arrearages that are actually paid to Dan. So to the extent that they're not paid to Dan or they're paid to a trust fund for the children, it doesn't reach it. And in fact, the district court specifically recognized that if there were an argument to be made that it didn't belong to Dan, then that she would modify the restitution order. And I think it comes down to that this is child support funds being used to pay for child support or child care costs, which makes it equitable and just under both California law. That assumes that there are no unmet needs of these children to which the arrearages could have been used. I mean, that assumes that by paying off Pena-Canel, that that's all that they would have been entitled to, whereas there could well have been, in fact, in these circumstances, much more likely to be lots of unmet needs. That's true, but a lot of unmet needs doesn't mean that the need that was met, in this case by Pena-Canel's for servitude, shouldn't be paid. That would really just be giving the kids a windfall and saying, well, they might, you know, have tuition needs as well as child care needs. It's a windfall to which they're entitled. If one believes that Dan is simply the conduit for money that is theirs up until the age of 18, that's a windfall to which they're entitled. I have to also say, as a footnote, speaking of windfalls, Pena-Canel won, what, $500,000 in the civil court? I have to confess I don't know very much about the civil proceedings that are related to this or the aftermath of that, so I apologize. I'm unable to give you a question. I'm wondering whether that comes into the equities at all. And I think that's something that Dan could certainly bring to the courts, district courts' attention during a modification proceeding, which, as far as I know, it hasn't. Why do you, why does the government need an order that's directed to child support? If she gets the money, she has to pay the restitution. I mean, if she has custody of the money, if she receives the money, theoretically, then that's that. She can pay restitution on it. But what this order says is it's money from a particular source that's governed by state law and a state court order. Well, the district court's concern was that sometimes restitution orders are theoretical and that there's no actual money. She was very, the district court was very concerned that the victim in this case received some back wages and that this was a concrete pot of money that could be used to, at the very least, get something for her years of labor. I've exceeded my time. I would just like to say that I believe that there's sufficient evidence on all the other grounds and ask for an affirmance. Before you step down, I want to make sure that Judge Fletcher, did you have any questions? No. It's a difficult issue in the restitution, and I guess I'll leave it there. All right. I appreciate that. Thank you, Your Honor. And we'll give you two minutes for rebuttal, as we promised. I want to acknowledge one of Judge Gertner's observations, which is one of the reasons that I think this case is kind of at the margins of Section 1589, and that is that the general dynamics inherent in any nanny-mother-family relationship or nanny-father relationship, for that matter, is that the nanny's going to feel some amount of obligation. That much is given. The question here is, does this rise to the level of forced labor under the statute? Where the government and the defendant part company, at least with respect to this issue, is precisely what was directed to the jury with respect to Ms. Don's direction to Ms. Pena-Canal about the kids. Yes, she said, what will happen if you leave me? You know, the government can come and take my kids. All right. We have one statement kind of in isolation that anybody might have uttered in the course of their relationship with their nanny. I can't think of any person. But you can't take it in isolation. That's the problem. There's a course of conduct that began with the visa petition in Peru and ends with that comment. And again, there are two narratives, and the jury accepted one of them. That's the problem. Well, I don't necessarily see it as two distinct narratives, Judge Gertner, and here's why. You have to look, number one, at the manner in which the case was submitted to the jury. What's the government's theory? Does you might take my children away fit into financial harm? No, it does not. Does it fit into reputational harm? No, it does not. I mean, it's some kind of discrete piece of evidence. It's kind of floating out there, but it's really untethered to anything that the government relied upon in determining that the ---- It's a form of emotional coercion, all of it. I mean, that's the government's collective theory, is that there was, similar to, I suppose, a battered woman syndrome, the victim's not always going to recognize some of the manners of coercion, and so the government put them out there, and the jury believed it. Okay. And that brings me to my other, and I guess concluding thought, is that this reasonable person, which concededly is kind of a part of the instruction, it's part of the statute, but it's a limit. A reasonable person standard is a limit on liability, so that irrational conduct does not result in criminal liability. It's not a position that the government can resort to when they have a complaining witness that does not necessarily testify in conformity with what the elements require to establish a conviction or establish liability. The government shouldn't just be able to fall back and say, well, maybe this particular defendant, excuse me, this particular complaining witness didn't say it. But a reasonable person probably would have thought that. I see the reasonable person standard and what you can infer and what you can determine about the defendant's intent as being something that is ---- it's just used a little bit differently. I think reasonable person is a limit, not necessarily a tool for the government to use when there are deficiencies in its own evidence. I see that my time is up. Thank you, counsel. Judge Fletcher, do you have any questions? Nothing. Thank you. Thank you both. Thank you very much. United States v. Swarson will be submitted and
judges: Gertner, Fletcher B. , Thomas